**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID SCOTT GAYLOR,<br><br>             Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>             Defendant. | Case No. 1:12-CV-1214-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |

      Plaintiff David Gaylor ("Plaintiff"), by attorney Ann M. Cerney, seeks review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits (DIB) under Title II and supplemental security income (SSI) under Title XVI of the Social Security Act.[1] The Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based upon proper legal standards, and affirms.

/ / /

/ / /

---

[1] DIB is paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. § 401 *et seq*. SSI is paid to disabled persons with low income. 42 U.S.C. § 1382 *et seq*. Only DIB is paid retroactively, up to twelve months from the application date. 20 C.F.R. §§ 404.621(a)(1), 416.335. Where the applicable DIB and SSI regulations are virtually identical, this opinion will identify only one of these.

1

**I.      Procedural History**

Plaintiff claims disability as of November 2006. His previous application for benefits was denied at an initial determination in December 2007, and the parties do not dispute that the finding is *res judicata* through that date. The Court describes medical records from prior to December 2007 for the purpose of background only.

Plaintiff again applied for benefits in April 2008 and was denied initially and on redetermination. After a hearing on March 10, 2010, ALJ William C. Thompson denied his applications in a decision dated May 28, 2010. AR 14-24. The Appeals Council denied review on June 7, 2012. AR 1-5. Plaintiff filed his complaint in this Court on July 25, 2012. *See* 42 USC § 405(b)(1). The parties consented to magistrate jurisdiction and have submitted their cross-briefs without oral argument.

**II.     Scope of Review**

Congress has provided a limited scope of review of a decision to deny benefits. First, this Court reviews only the Commissioner's "final decision." 42 U.S.C. § 405(g). Here, because the Appeals Council denied review, that is the ALJ's decision. *Sims v. Apfel*, 530 U.S. 103, 106 (2000); *cf. Brewes v. Comm'r*, 682 F.3d 1157, 1161-62 (9th Cir. 2012) (describing limited consideration of Appeals Council's decision "as a practical matter"). Furthermore, this Court reviews only whether this decision applied proper legal standards and made findings supported by substantial evidence. *Bray v. Comm'r*, 554 F.3d 1219, 1222 (9th Cir. 2009). Substantial evidence is more than a scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. Where the record as a whole can support either grant or denial, the Court may not substitute its judgment. *Id*.

**III.    Record Evidence**

**Records prior to December 2007 (*res judicata* period)**

Plaintiff's records begin in November 2006, when Plaintiff was 42 years old (born 05/30/64). As he would later report, his medical history prior to this time included a right carpal tunnel release in 1996, an appendectomy in 1997, and gout in both knees which was treated with

arthroscopic surgery "years ago" and which caused him "no problems" after that. AR 44, 308, 464. Plaintiff also reported suffering from asthma. AR 308.

Plaintiff claims he injured himself on November 15, 2006 while employed as a groundskeeper. He had previously held a similar position for thirteen years, but at the time of his injury he had only been employed for five weeks after an eleven-month period of unemployment. AR 36-37, 436. He was bagging and stacking sand when he heard a "pop" in his back. AR 256-58. Within several hours he began to experience back pain. *Id*. He reported this the next day, and he sought treatment on November 20, 2006 at the Occupational Health Services facility at Dameron Hospital in Stockton, the facility at which he would receive most of his treatment in this case. AR 256-58. He was treated by Dan Stringari, PA-C/Dr. Corky Hall, the company physician. At the time of this visit the pain was "severe." A lumbosacral spine x-ray was negative. He was diagnosed with lumbosacral strain and told to take acetaminophen, do range of motion activities, and apply warm compresses. He was released to modified work duties (no frequent lifting over 15 pounds) and told to return for a follow-up in a week. AR 258, 259. Follow-ups occurred on November 27 and November 29. Physical therapy was suggested and he was restricted to no frequent lifting over 15 pounds. AR 260-70. The next visit was on December 6, 2006 with Mike Dixon, PA-C/Dr. Hall. AR 282-83. Plaintiff had an antalgic gait and a guarding posture. There was "not much change" in his pain; he characterized this as soreness and low back pain radiating to his buttocks and tailbone. AR 282. He requested stronger medicine, "like Vicodin." He was prescribed hydrocodone. His lifting limitation remained at "no frequent lifting over 15 pounds." AR 283.

That same week, the insurance carrier approved the physical therapy request. AR 273. However, the physical therapy had to be temporarily deferred. One week later, on December 15, 2006, Plaintiff was taken by ambulance to Mark Twain hospital (he was found ambulatory at the scene). AR 294. He complained of severe and burning lumbar pain, radiating to the back and leg, at a "9/10." AR 291. He had not taken any pain medications because of ethanol consumption. The nurse's impression was sciatica. AR 288, 290. At the next follow-up at Dameron Hospital four days later, Plaintiff had a decreased lumbosacral range of motion, and leg-raising was positive in both legs. AR 295. A lumbar spine MRI was set for December 27, 2006 to rule out nerve root

compression from a lumbosacral herniated disc. The results were normal, with "no neuropathic impingement of nerve roots seen at any level of the lumbar spine." AR 296.

At his checkup the following week, Plaintiff challenged these MRI findings: he said that he was still in a constant pain, with radiating pain (or numbness—the record is unclear) in both legs through the buttock, thigh, and calf and down to the foot. AR 298. Ranges of motion had decreased further, although the straight leg raise was no longer positive. Plaintiff again asked for Vicodin. PA-C Stringari/Dr. Hall denied this "due to clinical findings." He noted Plaintiff's "history of chronic [alcohol] use" and noted that Plaintiff "continues to drink to medicate himself." He made a notation that any request for Vicodin should be denied in the subsequent follow-up appointment, and instead renewed Plaintiff's hydrocodone prescription. AR 298. However, he did seek urgent authorization for an orthopedic consultation. AR 298. At the next follow-up on January 19, 2007, Plaintiff continued to describe a feeling of "pinched nerves in the lower back" and he was given a trial of Lyrica "for neurogenic pain control." AR 302. At the next follow-up on January 31, 2007 he was switched to a trial of nortriptyline which was also not renewed. AR 304. Celebrex was added at the February 5, 2007 appointment; this too was not renewed. AR 306. Up to this point no changes had been made to his work restrictions, which remained at "no frequent lifting over 15 pounds." AR 298, 302, 304.

On January 31, 2007, Plaintiff obtained an orthopedic consultation from Dr. Gary Alegre. This does not appear in the record, but a summary is available. AR 441. The assessment was lumbosacral strain and possible SI joint dysfunction. The consultant did not feel the lower extremity symptoms were radicular, and recommended anti-inflammatories and physical therapy for spine stabilization and SI joint stabilization. If these failed, an SI joint injection might be warranted, but not an epidural steroid. Upon reviewing this orthopedic consultation, Plaintiff's doctors at Dameron approved him to begin a physical therapy regimen. AR 305, 307. Plaintiff attended nine sessions between February 13 and March 28, 2007. AR 243-52. He showed some improvement. AR 250.

During this period, Plaintiff also continued to have follow-ups at the hospital. On March 20, 2007, the note observed that Plaintiff's "primary complaint appears to be localized to [the] right SI

joint" and prescribed sessions with a chiropractor, Dr. Smalley. AR 314-19. It also prescribed Tramadol and a TENS unit. AR 319. Plaintiff responded well to the TENS. AR 250. At this same appointment in March, Plaintiff's work capacity was changed for the first time: "lifting should be limited to 10 pounds or less ... effective ... February 26, 2007." AR 319, 557. (A visit did occur on February 26, 2007 but does not appear in the record. AR 491.).

At visits in March, April, and May, Plaintiff's restrictions remained at 10 pounds. AR 329, 308, 332, 335, 338, 340, 343, 345, 348, 352. His medication now included Vicodin. AR 336, 345, 375. In May, Dr. Rossman or his assistant believed Plaintiff to be at a high risk for GI bleeding due to "chronic alcohol consumption" and therefore recommended discontinuing the use of non-steroidal anti-inflammatory drugs while initiating another trial of Lyrica. He suggested iontophoresis patches. AR 345. By late May, Lyrica was noted as not helpful, and pain management was suggested. AR 443.

After examining Plaintiff on July 9, 2007, physician's assistant Mike Dixon (or Dr. Rossman) apparently made a second revision to Plaintiff's lifting limitation, raising it to 25 pounds. AR 383-84, 443. Plaintiff moved with slight difficulty and could heel stand and walk; his lumbar spine range of motion was limited; lower extremity sensation was normal; straight leg raise test was negative; there was some tenderness over the left sacroiliac joint; and he could squat. Mr. Dixon prescribed hydrocodone. AR 383. Three days later, on July 12, 2007, Plaintiff's lifting limitation was again 10 pounds; this is the fourth distinct limitation from Dameron Hospital on record. AR 443. On July 26, 2007, he was back to 25 pounds (fifth limitation from Dameron Hospital). *Id*. (These last two visits do not appear in the record but are summarized within a later consultative exam. AR 443.) By August 24 he was back to 10 pounds again (sixth limitation), now using language taken verbatim from some previous medical record, including the statement that the limitation was "effective" February 26, 2007. *Compare* AR 629 (August 24) *with* AR 547 (April 3), AR 557 (March 20). There is no explanation for these back-and-forth changes or for the reuse of old language.

On August 9, 2007, Plaintiff consulted with Alan Jakubowski, M.D. for pain management. AR 372-74. Dr. Jakubowski noted lumbar pain with palpation but found Plaintiff's heel/toe walking

5

was intact, he could squat to stand, and he had 5/5 strength. AR 373. He noted a negative bilateral straight leg raise test and pain with left axial rotation. His impression was low back pain and left lumbar facet syndrome. He recommended facet injections and physical therapy. AR 374.

On September 4, 2007, physician's assistant Dan Stringari (or Dr. Rossman) expressed doubts regarding Dr. Jakubowski's suggestion of facet joint pain syndrome, as this diagnosis appeared to be inconsistent with the normal x-ray and MRI studies. AR 398. He expressed reservations whether a facet joint injection procedure was indicated, and agreed to seek authorization for only one such procedure, followed by "return to full work" "if there is no relief of his pain." He discussed with Plaintiff "personal issues that could be affecting his condition such as chronic alcohol use." Plaintiff "drinks daily over a six pack of beer, and a couple to several shots of whisky." He questioned Plaintiff's statement that he "drinks to kill the pain," noting that he drank alcohol daily before his injury. He instructed Plaintiff to phase off Vicodin and stated that he would no longer refill it "due to his chronic use of alcohol." AR 398-99. (On this date, Stringari/Rossman also stated an impression of lumbar strain, chronic ethanol abuse, and probable alcoholic neuropathy. Their note is not available in the record but was remarked upon in a later exam. AR 444.) On this date, lifting capacity was raised to "25 pounds or less" (seventh limitation from Dameron Hospital). AR 399.

On September 10, 2007, the note reflects that Plaintiff reported to Dr. Rossman that after recently being released to modified duties, he went back to work, had a difficult time, experienced pain radiating down his leg, and was terminated from his job. AR 409; *see* AR 435. Without further discussion, the note again stated that Plaintiff could do "no lifting more than 10 pounds" (eighth limitation), with the further caveat that he must "limit bending, twisting, and stooping at the waist." AR 409. Two weeks later, on September 25, 2007, Dr. Rossman's work restrictions were again to "[n]o lifting more than 25 pounds" (ninth limitation). AR 413. On October 19, 2007, Dr. Rossman repeated the 10 pounds/limit bending limitation (tenth limitation). AR 642. On December 3, 2007, Dr. Rossman noted similar objective findings as in recent examinations; however, the limitation was to lift no more than 25 pounds (eleventh limitation). AR 421.

On December 6, 2007, Dr. Alegre performed a second orthopedic examination. AR 428-30. Dr. Alegre told Plaintiff that he was "not really interested in taking over his care, as I don't think there is really much I can offer him." He suggested to Plaintiff that he might be better suited to seeing a physiatrist for further treatment and management, possibly including EMG and nerve conduction studies to see if there is any evidence of peripheral neuropathy given his history of alcoholism. He also told Plaintiff to look into SI joint injections. AR 429.

On December 7, 2007, Plaintiff's first application for disability benefits was denied at the initial determination stage. AR 142, 476. Plaintiff did not request reconsideration.

**Covered Period**

On December 13, 2007, qualified medical evaluator and orthopedic surgeon, Edward J. Troy, M.D., evaluated Plaintiff as part of his worker's compensation case. AR 434-46. Plaintiff said he could lift 25 pounds or less. AR 437. He drank on average six beers a day. AR 438. Upon examination, Plaintiff had tenderness on the left side of the lumbosacral region and left buttock, but his thoracolumbar motion was "quite good." AR 438. Plaintiff had a normal gait; he complained of back pain when walking on his heels but walked on the heels and toes without difficulty. He had diminished sensation in the lower and upper extremities, no focal motor weakness, and a full range of motion of the hip. AR 439.

Dr. Troy requested to be sent Plaintiff's MRI results, and suggested the need for electrodiagnostic studies to rule out neuropathy. Even without these studies, he opined that Plaintiff "certainly" could carry out "light work" and was permanent and stationary. AR 445-46. (Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. See 20 C.F.R. § 404.1567(b).)

At checkups in January 2008, Plaintiff again asked to be put on Vicodin, because he was unable to sleep. He was instead prescribed ibuprofen and omeprazole. His restriction was unchanged at "no lifting more than 25 pounds." AR 448-51.

On February 20, 2008, Plaintiff underwent EMG/nerve conduction studies. While there was no evidence of a lumbar radiculopathy, the "study [was] consistent with a polyneuropathy." The doctor "suggest[ed] clinical correlation." AR 457.

At a checkup on March 10, 2008, Plaintiff told Dr. Rossman that he had "nerve damage." He complained of constant numbness on his back and shooting pains, radiating to his toes, and no feeling in his left hip or from his left elbow down to his hand. Dr. Rossman released him to a 25-pound lifting restriction. AR 461. On March 20, 2008, the note was unchanged. The March 25, 2008 visit was Plaintiff's last with Dr. Rossman (and, with the exception of chiropractor visits, the last treatment for the one-year period through March 2009). Dr. Rossman again stated a work capacity of lifting no more than ten pounds (twelfth limitation). AR 352. In stating this limitation, Dr. Rossman recited verbatim the language from the April 13, 2007 note, including the statement that "the effective date for this work capacity is April 13, 2007." *Compare* AR 573 *with* AR 352. Dr. Rossman did not characterize this work capacity as permanent and stationary, and in fact the note states that he meant to "reschedule P&S," although it does not appear that this ever happened.

On March 27, 2008, Dr. Troy wrote a supplemental report based on his review of the MRI and the electrodiagnostic studies. He was "not impressed" regarding any "significant lumbar problem," citing the MRI as well as the history and examination. AR 355. However, the EMG was "significantly abnormal." Dr. Troy opined that "all of his symptoms" were a result of peripheral neuropathy, "likely" due to alcoholic polyneuropathy. AR 694-95. Dr. Troy did not offer a revised assessment of Plaintiff's limitations. Instead, he opined that his "complaints of upper and lower extremity findings" are "on the basis of his polyneuropathy," given the clinical evidence of peripheral neuropathy. He "strongly recommend[ed] a neurologic assessment on a self-procured, nonindustrial basis." AR 695.

In April 2008, Plaintiff filed his current application for disability benefits. AR 126, 476. Plaintiff alleged disability due to a back, tailbone, and hip injury; gout; arthritis; and asthma. AR 146.

On July 17, 2008, at the request of the state agency, consultative examining physician Joseph M. Garfinkel, M.D., conducted an internal medicine evaluation. AR 464-68. Dr. Garfinkel did not review any medical records; Plaintiff was his source of medical history for the evaluation. Plaintiff described chronic, radiating back pain with numbness and tingling in his feet and hands. He mentioned that he drank "three 12-packs of beer per week," AR 465; however, he did not seem

to mention the electrodiagnostic studies or the fact that Dr. Troy had diagnosed peripheral neuropathy. Plaintiff also mentioned his "history of gout," for which he had "surgery" in the past (referring, presumably, to his successful knee arthroscopies). AR 464. He now complained that that "his lower legs and feet and hands sometimes swell up and get red." AR 464.

Upon examination, Dr. Garfinkel noted limited range of motion of the back and a straight leg raise test which produced low back pain radiating to the left and right legs at 30 and 45 degrees, respectively. There was guarding and tenderness of the lumbar paraspinal muscles. AR 466. Plaintiff had pain on upper and lower extremity range of motion but had a full range of motion in each. AR 467. Dr. Garfinkel noted that Plaintiff also had a deformity of the fifth digit of both hands. AR 467. He noted a normal range of motion of the shoulders, elbows, wrists, hips, knees, and ankles; no tenderness to palpation of the wrists; "slight, subjective" decreased sensation in both hands; good muscle tone with good active motion; and strength at 5/5 in all extremities. AR 467. Plaintiff's gait was normal and Plaintiff was able to stand and walk on his heels and toes. AR 467.

Dr. Garfinkel diagnosed chronic back pain with radiculopathy, a history of numbness and tingling in the hands of unknown etiology, gout, and a history of carpal tunnel surgery (reported by Plaintiff as occurring in 1996). AR 464, 468. Dr. Garfinkel opined that Plaintiff could perform a range of light work (lifting and carrying 20 pounds occasionally, 10 pounds frequently); could stand and walk for 6 hours and sit for 6 hours in an 8-hour day; had to alternate between standing and sitting every 2 hours to relieve pain or discomfort; and could occasionally climb, stoop, kneel, and crouch. He had no manipulative limitations. AR 468.

On September 9, 2008, non-examining state agency physician Sharon Amon, M.D., reviewed the record and completed a "Physical Residual Functional Capacity Assessment" form. She opined that Plaintiff could perform light work and frequently balance, and could occasionally climb, stoop, kneel, crouch, and crawl. In terms of manipulative limitations, Plaintiff could frequently handle, finger, and reach in all directions, except that he could only occasionally reach overhead bilaterally. AR 471-75. However, in a "case analysis" form completed on the same day, Dr. Amon stated a less limiting RFC, indicating that all manipulatives could be done frequently.

AR 477. Although Dr. Amon elsewhere discussed the degree of limitation that would be consistent with disability, she did not explicitly indicate why she changed her RFC finding. AR 476.

On September 15, 2008, Plaintiff's claim was denied initially. AR 62.

On September 16, 2008, Plaintiff underwent an examination with Dr. Robert Walker, a chiropractor. Visits continued through January 2009. AR 197. At the initial visit, Plaintiff complained of radiating back pain, causing difficulty sleeping, depression, and anxiety. AR 359. Again, Dr. Walker did not appear to be aware of the electrodiagnostic studies which caused Dr. Troy to diagnose polyneuropathy, nor did he seem to know of the medical images showing a normal lumbar back. Dr. Walker diagnosed thoracic & lumbosacral segmental dysfunction; paraspinal myofascitis; lumbar-related paresthesia; insomnia; and depression and anxiety. Dr. Walker recommended a month of chiropractic treatment as well as a psychological evaluation for his alleged injury-related depression and anxiety.

The record contains a letter dated December 22, 2008 from Karen Holt, the physical therapist who had nine sessions with Plaintiff between February 13 and March 28, 2007. She wrote that when Plaintiff's physical therapy had concluded in March 2007, his pain had "improved somewhat" but remained "moderate to severe" and "remained a limiting factor in his mobility and ability to work." AR 479.

On January 15, 2009, Plaintiff's claim was denied on reconsideration. AR 67.

Beginning in March 2009 Plaintiff had several visits to the medical clinics at Mark Twain St. Joseph Hospital. These notes are partially illegible. The treating personnel appear to have been ignorant of the prior medical evidence supporting a diagnosis of alcoholic neuropathy.

On March 9, 2009, Plaintiff complained of bronchitis as well as back pain. AR 749. The next visit in the record is from six months later, on September 22, 2009. AR 748. Plaintiff complained of chronic lower back pain with radiculopathy in his right lower extremity for the past two years. He reported that he never had "any workup or x-ray studies for that," and the doctor suggested obtaining a lower spine x-ray. The record apparently states that Plaintiff was taking Vicodin. AR 748; *see* AR 744. The x-ray was taken on September 23, 2009 and showed "no significant abnormality in the lumbar spine." AR 727, 747. On October 5, 2009, Dr. Tony Tran

reviewed these results. He assessed low back pain with radiculopathy to right lower extremities and questionable sciatica, although the x-ray failed to show any significant abnormalities. Dr. Tran recommended an MRI, renewed Vicodin, and prescribed Neurontin. He also sent out blood labs to evaluate possible diabetes. AR 744.

On October 9, 2009, Plaintiff was taken to the emergency room by paramedics, complaining of bilateral leg pain. 708-11, 719. He said he had not had feeling in his legs for six months. His blood pressure was elevated. He had self-treated that day with Vicodin and beer. He said he used to be a heavy beer drinker but had cut back to six beers a day. He had low oxygen saturation. He was given oxygen and an IV dose of Morphine, Valium, and Cardizem. AR 709.

On October 21, 2009, the review of the blood labs showed CBC and CMP within normal limits but an elevated glucose of 138. AR 741-43. He was diagnosed with Type 2 Diabetes. AR 741. Refills for back pain were deferred pending MRI approval. A lumbar MRI was performed on November 25, 2009 and was "essentially normal for age," showing "minimal degenerative facet arthropathy" but "no evidence of nerve compromise." AR 704, 739. The record contains additional clinical checkups on December 2 and 23, 2009, with no significant findings. AR 738, 737.

On January 14, 2010, Plaintiff complained of "worsening" gout-related pain in his hand (fifth digit). AR 736. He requested and was given a refill of Lortab, and was also put on Indocin to treat gout. On January 25, 2010, Plaintiff complained of gout-related swelling in his hand (fifth digit) as well as back pain. He was diagnosed with a Tophi lesion of the PIP joints of the upper extremity and was given an injection of Toradol. The note reflects an orthopedic referral for a "surgical option." AR 735.

**Plaintiff's testimony**

At the hearing on March 10, 2010, Plaintiff said he had back pain with nerve damage and numbness in his legs. AR 37, 39. He had not had surgery but was taking Lortab for pain; his insurance was not approving injections for pain. AR 38-39. He had received physical therapy several months after his injury, but "after a couple months, I just slipped back into where I was before right after my injury." AR 39. The back pain gave him trouble sleeping and he was often tired. AR 45. It also caused trouble reaching to the left. AR 46. Twisting bothered him "not real

11

bad"; bending bothered him more so. AR 47. However, he could reach over his head; the pain this caused was "just a little," "not too bad." AR 46. He walked about a half a mile a day without an assistive device; to walk "a little longer than that" he needed a cane, though he was not prescribed one. AR 40. He could stand for "an hour or two" and could sit for "about an hour" at a time. AR 41.

Plaintiff mentioned a tentative diagnosis of diabetes. AR 42. However, he acknowledged that his doctor was questioning this diagnosis and was not medicating him for it. AR 42, 50.

He also had gout in his hands, mostly in his right (dominant) hand. He would sometimes drop things. AR 45. The knuckle at the fingernail of his left and right pinky fingers would get swollen and "sometimes" cause "some" pain. AR 43. This was the only part of his hands that hurt. He said he was going to have an amputation of this portion of his right little finger. AR 44.

**Testimony of Vocational Expert**

At the hearing, Stephen B. Schmidt testified as a vocational expert. He described how various mental and physical limitations would impact Plaintiff's ability to work. *See* 20 C.F.R. §404.1560. First, he considered whether a person with these limitations and Plaintiff's work experience could return to that past work. If not, he further considered whether that person, given Plaintiff's age and education, could adjust to new work. In making this analysis, he characterized Plaintiff's past work as Groundskeeper II (medium—heavy as performed, 3).[2]

The parties asked Mr. Schmidt to consider several hypothetical sets of limitations. In the first, raised by the ALJ, the person could stand and/or walk at least six hours and sit six hours in an eight-hour day; needed a sit/stand option at two-hour intervals; could not climb ladders, ropes, or scaffolding; could not work at heights or around hazardous moving machinery; and could only do work involving "relatively simple instructions." AR 50. While this ruled out Plaintiff's past work, Mr. Schmidt stated that the person could do several other jobs, totaling 70,000 jobs. AR 51. These jobs were "packing," "assembly," and "semiconductor worker."

The second hypothetical, posed by Defendant, added limitations to the first. The question seems to have confused the vocational expert. Defendant meant to ask about a person who could

---

[2] In the parenthetical, the strength rating captures how much exertion the job requires and whether this is occasional (up to a third of a day), frequent (two thirds), or constant. The Specific Vocational Preparation number ranks, from one to nine, how long it takes to learn the job. Dictionary of Occupational Titles (4th ed.1991) Appendix C.

bend only rarely and could do other posturals occasionally. AR 51-52. The expert, however, answered the question for a person who could do all these posturals occasionally. For that person, there would be no impact on the jobs. Defendant expressed that he understood the difference and did not rephrase the question.

The third hypothetical, posed by Defendant, also added limitations to the first: This person was unable to reach to the left side. This would preclude all work.

The fourth hypothetical, posed by Defendant, was also asked unclearly. Defendant sought to "add" limitations to the person in the second hypothetical. However, he characterized the person as being limited to only rarely bending, despite having acknowledged that this was not part of that hypothetical. Furthermore, he was unclear as to what additional limitations he had in mind: he stated a limitation of frequent fingering and handling, but he may have also meant to include reaching. Defendant asked, "Would those jobs remain?" and the expert said "No."

At this point the ALJ expressed confusion at Defendant's hypothetical, and asked, "If reaching, handling, and fingering were limited to frequent bilaterally, was your answer that he could do the job you identified?" The expert's reply was no less confusing. He said, "No, he could not. None of those positions require constant bilateral upper extremity activity." AR 53.

Judicial notice is taken that for the packing job, reaching and handling are constant. DOT 920.685-026, available at 1991 WL 687929. For the semiconductor job, reaching and handling are frequent. DOT 590.684-034, available at 1991 WL 684573. The DOT number in the hearing transcript for the "assembly" job does not exist.

**IV.  Disability Standard**

To be disabled, a claimant must have impairments which foreclose all meaningful employment for at least twelve months. 42 U.S.C. § 1382c(a)(3). To make the disability determination more uniform and efficient, ALJs follow a five-step "sequential evaluation process," stopping once they reach a dispositive finding. 20 C.F.R. §§ 404.1520, 1594(b)(5).

The sequential process begins with a "*de minimis* screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir.1996). At steps one and two, the claimant

must verify that he is not meaningfully employed and in fact has severe impairments. Once a he passes this screening, the remaining steps examine whether he is disabled.

The claimant may prove this in two ways. One way—considered at step three—is to have a condition that is disabling by definition. *See* 20 C.F.R. Pt. 4, Subpt. P, App. 1 (the "listings"). Failing this, he must present evidence of his residual functional capacity ("RFC," the most he can do despite his limitations). The ALJ determines this RFC, then at steps four and five applies this to the world of work. If the claimant's RFC forecloses his past work, and if the Commissioner cannot satisfy her burden to identify a significant number of other jobs that the claimant could learn, then the claimant is disabled.

## V.     **The ALJ's Decision**

The ALJ followed the five-step sequential evaluation process outlined above. At steps one and two, the ALJ found that Plaintiff's claim was not clearly meritless: he had not worked since the alleged date of disability and he had severe impairments capable of lasting twelve months. These included a lumbar strain/sprain and neuropathy. They did not include gout, diabetes, depression, or sleep disturbance.

However, Plaintiff could not prove he was disabled. At step three, his condition did not meet or equal a "listing," and at steps four and five his RFC and vocational profile did not foreclose meaningful work. Specifically, his RFC corresponded to the first hypothetical posed to the vocational expert. Although this RFC foreclosed his past work, the ALJ identified a significant number of other jobs that he could learn—namely, those described in the vocational expert's response to that hypothetical.

## VI.     **Discussion**

On appeal, Plaintiff identifies two errors. First, the ALJ failed to articulate specific and legitimate reasons for not crediting Dr. Rossman's "most current" opinion as to the amount that Plaintiff could lift. Second, the ALJ erred in rejecting a portion of the RFC opinion of Dr. Amon, a non-examining expert. Specifically, Dr. Amon limited Plaintiff to frequent manipulatives, but the ALJ found no manipulative limitations.

**Dr. Rossman**

Dr. Rossman was one of Plaintiff's treating physicians. He or his colleagues at Dameron Hospital issued a total of twelve assessments of Plaintiff's lifting ability in a sixteen-month period from November 2006 to March 2008. The last of these, from March 25, 2008, indicated that Plaintiff could lift 10 pounds. The ALJ, however, found that Plaintiff could lift 20 pounds occasionally and 10 frequently. Plaintiff contends that the ALJ did not give adequate reasons for disagreeing with Dr. Rossman's "most current," 10-pound limitation.

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Id*. The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Id*. The ALJ may only reject a treating physician's evaluations in favor of another physician's by providing "specific and legitimate reasons" supported by substantial evidence in the record. *Orn*, 495 F.3d at 633. Possible reasons may include (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 20 C.F.R. § 404.1527(d).

Dr. Rossman's 10-pound assessment was the last in a bizarre series of twelve flip-flopping assessments. This confusion gave the ALJ grounds for skepticism. Referring to records from both the adjudicated and unadjudicated periods, the ALJ noted that "these opinions are not entirely consistent as the doctors alternatively opine that the claimant can lift from 10 to 25 pounds without any significant differences in objective findings." AR 22. The ALJ thus invokes both supportability and consistency in questioning Dr. Rossman's findings. He did not, however, entirely reject these findings. Rather, the ALJ characterized these notes as stating a range of limitations, "from 10-25

pounds." He also cited the opinions of consultative examiners Drs. Garfinkel and Troy as well as Plaintiff's self-proclaimed limitation of 25 pounds.

The ALJ's caution was warranted. At least some of these fluctuations were clearly artifacts of the computerized records system at Dameron Hospital. This is the only explanation for the frequent hairpin turns in assessments—including six separate opinions stated in a four-month period between May and September 2007—few of which are supported by any explanation or even any meaningful change in symptoms. The record in question here, from March 25, 2008, shows further evidence of computer error: It is one of several records which appears to make a ten-pound limitation retroactive to April 13, 2007, but these all contain the identical language as the April 13, 2007 record itself, and in the intervening period there are other notes showing greater limitations. This heedless regurgitation of past notes is a pattern in the records from Dameron Hospital. *See* comments at AR 442-44 ¶¶18, 27, 31; *see e.g.,* AR 308 (repeating text, including: "He feels it is improving slightly ... He feels it is not improving."). The common practice is to simply paste old records into new records. *Compare, e.g.*, AR 398-99 (on September 4, 2007, Stringari/Rossman state that no future refills of Vicodin would be given) *with* AR 415, 417, 419 (throughout October 2007, though Vicodin is not listed among Plaintiff's "prescriptions," it remains a "current medication.").

Plaintiff believes that the ALJ should have given special consideration to the last of Dr. Rossman's opinions because it is the most recent. But this record makes no special claim to deference. It explicitly states that it is not intended as a final assessment of Plaintiff's limitations. Plaintiff argues that the timing of the EMG studies is significant, but it is not. Between the EMG findings and the final assessment to ten pounds, there were two intervening checkups at which Dr. Rossman made no changes to Plaintiff's limitations. At this checkup, the third, Dr. Rossman gave no reasons for changing these limitations. The findings of his physical examination were essentially the same as those at his December 2007 examination, except that Plaintiff now had a full, rather than a limited, lumbar range of motion. AR 352-53, 421.

16

The ALJ did not need to cite each of these reasons. Simply by observing that the statements of limitation were inconsistent and unsupported, he gave abundantly good cause for questioning these opinions and instead construing them as a range (from 10 to 25 pounds).

**Dr. Amon**

The ALJ considered and discussed the opinion of non-examining state agency physician Dr. Amon, who opined that Plaintiff should have certain manipulative limitations. However, he agreed with examining Drs. Troy and Garfinkel that none were warranted.

Nonexamining source opinions are medical opinions that the ALJ must consider and weigh. 20 C.F.R. § 404.1527(d), (f). An ALJ "may not ignore" state agency medical consultant opinions "and must explain the weight given to these opinions in their decisions." SSR 96–6p.

The ALJ adequately explained his findings. He characterized Plaintiff's gout as non-severe, but he noted that there was no evidence of manipulative restrictions or of treatment until January 14 and 25, 2010. Even by the time of the ALJ's decision in May 2010, the ALJ found that any manipulative impairment did not even meet the one-year durational requirement. The ALJ also gave "significant weight" to Dr. Garfinkel's assessment. (Although Dr. Garfinkel did not view any records, he observed that Plaintiff had "normal strength in all extremities, but slight, subjective decreased sensation in both hands. Plaintiff complained of having gout, but there is no indication in the examination notes that Plaintiff was not attributing this to his knees, as he did in all of his Dameron Hospital records.) Dr. Troy also imposed no manipulative limitation, and he did not change this assessment when he received Plaintiff's EMG. Plaintiff testified that he would need to have his right pinky amputated but there was no evidence of this, nor was there evidence that doing so would cause more than minimal functional limitations.

The ALJ accurately characterized the record. Plaintiff argues that Plaintiff had a "long history of upper extremity symptoms," but the ALJ's remark was about the absence of *restrictions*. The mere presence of symptoms does not necessarily mean the individual experienced sufficiently significant limitation in his ability to perform basic work activities to constitute a severe impairment, or that any corresponding limitations would be warranted in the ALJ's RFC finding. *See* 20 C.F.R. § 404.1520(c); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228-29 (9th Cir.

2009). Similarly, Plaintiff's reference to his diagnosis of polyneuropathy does not mean he experienced any significant limitations. *Id.*; *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999) (None of the appellant's treating or examining physicians ever indicated he was disabled, and while "appellant clearly does suffer from diabetes, high blood pressure, and arthritis, there is no evidence to support his claim that those impairments are 'severe' "). For example, Plaintiff refers to the fact that had carpal tunnel syndrome and carpal tunnel release surgery. However, Plaintiff told Dr. Garfinkel that he had this surgery over 10 years prior in 1996. AR 464. He mentioned his history of gout, but he attributed this to his knees. In addition, upon examination, Dr. Garfinkel found Plaintiff had slight subjective decreased sensory in both hands but no evidence of tenderness to palpation of the wrists and a normal range of motion, and found no manipulative limitations necessary. AR 467-68. Plaintiff also refers to Dr. Troy's examination finding that Plaintiff had some diminished sensation of the upper extremities. AR 439. However, after his examination, Dr. Troy opined that Plaintiff could perform light work and did not opine as to any manipulative limitations. AR 445. He did not change this conclusion after receiving the EMG report. Similarly, though Dr. Garfinkel noted pain with range of motion of the upper extremities, he found Plaintiff still had a full range of motion and did not give any related limitations. AR 467-68.

Plaintiff's argument that the ALJ should have accorded more weight to Dr. Amon's opinion lacks merit. First, more weight is generally given to the opinion of an examining source than to the opinion of a source who has not performed an examination, and the ALJ properly accorded more weight to Dr. Garfinkel's opinion. AR 22. *See* 20 C.F.R. § 404.1527(d)(1). Furthermore, Plaintiff states that Dr. Amon relied on the findings of Drs. Troy and Garfinkel in giving her opinion, yet neither physician opined that any manipulative limitations was necessary. AR 445, 468. Moreover, Plaintiff himself testified during his hearing that the top knuckles of both hands were swollen and "sometimes" caused "some" pain, but that he did not have any pain in other part of his hands unrelated to gout, and that only the portions of his pinky fingers as described were painful. AR 43-44. Notably, though Dr. Amon opined at one point that Plaintiff could only occasionally reach overhead bilaterally, Plaintiff's testimony did not support such a limitation, as Plaintiff testified that he could reach over his head and that there was "just a little" pain but it was "not too bad." AR 46.

Dr. Amon's opinion was contradicted not only by the opinions of the examining physicians, but by Plaintiff himself, and the ALJ properly found no manipulative limitations were warranted. *See* C.F.R. § 404.1527(d)(4) (The more consistent a medical opinion is with the record as a whole, the more weight it is given).

**VII.    Conclusion**

The ALJ applied appropriate legal standards and substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the Court hereby AFFIRMS the agency's denial of benefits. The Clerk of Court is directed to enter judgment for Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:    **December 18, 2013**            **/s/ Sandra M. Snyder**
                                            UNITED STATES MAGISTRATE JUDGE